UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TABITHA MARIE MARTINEZ,

        Plaintiff,

   v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 16-cv-04960-JSC

**ORDER RE:
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

Re: Dkt. Nos. 24 & 25

     Plaintiff Tabitha Marie Martinez ("Plaintiff") seeks social security benefits for a combination of mental and physical impairments, including: bipolar disorder, depressive disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), morbid obesity, and coronary artery disease. (Administrative Record ("AR") 121, 270.) Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her benefits claim. Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment.[1] (Dkt. Nos. 24 & 25.) Because the Administrative Law Judge ("ALJ") improperly weighed the medical evidence and erred in her credibility determination of Plaintiff, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for further proceedings.

**LEGAL STANDARD**

     A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 9 & 11.)

United States District Court
Northern District of California

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

In May 2014, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title II of the Social Security Act. (AR 342.) In March 2015, Plaintiff filed a Title XVI application for SSI benefits to be heard along with the Title II claim. (*Id*.) Plaintiff alleged disability beginning October 1, 2013 caused by mental illness, heart problems, and morbid obesity. (AR 250.) The applications were denied initially and on reconsideration. (AR 151–55, 159–63.) Plaintiff then filed a request for a hearing before an ALJ. (AR 165–66.)

On October 26, 2015, a hearing was held before ALJ K. Kwon in San Rafael, California, during which both Plaintiff and a vocational expert ("VE") Lynda Berkeley testified. (AR 53.) On February 3, 2016, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was not disabled within the meaning of the Social Security Act and its regulations and, therefore, was not entitled to SSI benefits. (AR 35–7.) On May 24, 2016, the Appeals Council considered Plaintiff's request for review as well as the additional evidence she submitted, and denied review, making the ALJ's decision final. (AR 5–11.) Plaintiff commenced this action for judicial review on October 19, 2016 pursuant to 42 U.S.C. §§ 405(g), 1383(c). (Dkt. No. 1.)

Plaintiff was born on July 8, 1981. (AR 60.) Plaintiff suffers from mental illness, a heart problem, and morbid obesity. (AR 250.) At the time of the hearing, Plaintiff was 5'4'' and weighed approximately 436 pounds. (AR 69.) She is currently a resident of Lake County and is living with her three children. (AR 1, 60.) She attended Yuba College and Mendocino Community College and worked with children and adults with special needs. (AR 63–8.) In 2014, Plaintiff stopped working because of mental and physical issues and she has not worked since. (AR 64, 66–7.) Plaintiff alleges that her weight and bipolar disorder make it difficult for her to work and be around people, and that she relies on her daughter to assist her with activities of self-care and daily living. (AR 79–80, 97–8.)

## I.    Medical Evidence

Plaintiff has seen a variety of physicians as a result of her medical conditions. A discussion of the relevant medical evidence follows.

### A. Medical History

The earliest records date back to February 2012, when Plaintiff began as a regular patient of Clearlake Family Health Center. (AR 382.) Plaintiff also occasionally obtained treatment at the Lucerne Community Clinic and Lake County Behavioral Health.

#### i.    *2012 Medical History*

In September 2012, Plaintiff was initially assessed with severe depression and extreme anxiety or panic. (AR 627.) Nurse practitioner Sandra Peeke, who conducted Plaintiff's initial exam, noted that Plaintiff complained of "pain all over" following a car accident. (AR 629.) Ms. Peeke observed the following: myofascial pain and hematoma due to the car accident, morbid obesity with a BMI of 59, deconditioned, depression, anxiety, and PTSD. (AR 630–31.) In her appointments with Dr. Ronald Walker, who would later become Plaintiff's primary care physician, Plaintiff also reported migraines, depression, and anxiety. (AR 412–14.)

#### ii.    *2013 Medical History*

Throughout 2013, Plaintiff continued to see Dr. Walker, to whom she reported insomnia, tongue pain, shaking related to Lithium intake, depression/anxiety, and "getting aggressive," amid

other related health issues.  (AR 383, 393, 407, 408, 411.)   Among visits to other physicians, Plaintiff saw Dr. Daniel Lewis for a gynecology consultation in November.  (AR 477.)  Dr. Lewis noted Plaintiff's life-long struggle with weight, her weight of 383 pounds, and quoted Plaintiff as saying "I experienced rapid weight gain when on Seroquel and I don't exercise as I should."  (*Id.*)

In March 2013, Plaintiff was transferred from St Helena Hospital Clearlake to St Helena Hospital Napa Valley to see Dr. Elliot Wade and obtain higher-level care for chest pain.  (AR 429, 691.)  Dr. Wade noted that at the time, Plaintiff had also begun workup with Dr. Richard Parent (surgery) and Dr. Park (cardiology) for possible gastric bypass surgery in the future.  (*Id.*)

In June 2013, Plaintiff began bi-monthly 30-minute therapy sessions with licensed clinical social worker Norman Bigelman for relapse prevention and recovery support.  (AR 893–99.)  In August, Plaintiff admitted to Mr. Bigelman that she was dependent on opioids prescribed by her doctor.  (AR 897.)  The next month, Plaintiff advised him that she had recently withdrawn from her college courses because she felt "overwhelmed with the schedule that she created."  (AR 896.)  Two months later, however, Mr. Bigelman noted that Plaintiff was "excited about being hired by a behavioral program for adolescents," and had had "several other interviews that 'seemed positive.'"  (AR 894.)

Around the same time, Plaintiff was receiving mental health services at Lucerne Community Clinic for opioid dependence, PTSD, bipolar affective disorder, and depression.  (AR 368–77.)  There, Plaintiff saw Dr. Robert Gardner, whose notes indicate problems with opiates, using non-prescribed medication, body pain, bad menstrual cramps, 12 Vicodin, Percodan, Morphine for four years, and a history of methamphetamines.  (AR 368.)  The medical reports from this time period state that Plaintiff weighed 350 pounds with a BMI of 58.  (AR 368–77.)

In September, Plaintiff sought to replace her therapist at Lucerne Community Clinic with someone from Lake County Behavioral Health Department because Plaintiff could "no longer afford to drive to Lucerne."  (AR 455.)  Plaintiff was seen by therapist Daniel Sleeth who noted that Plaintiff had depression, intrusive thoughts, low self-esteem, "hard time coping," insecurity, co-dependency, continued suicidal ideation, and some cutting (although Plaintiff denied a plan or intent).  (AR 455–56.)  The treatment notes describe a history of childhood bullying and an

abusive relationship with her husband. (AR 463.) Therapist Sleeth also noted Plaintiff was in an on-going abusive relationship and that she was voluntarily getting "AODS treatment" and going to "AA and NA." (*Id*.) The notes indicate that Plaintiff's driver's license had been suspended for tickets and that she could not drive. (*Id*.) Finally, the diagnosis form states that the following clinical disorders began in 2013: PTSD, depressive disorder, cocaine abuse, and a personality disorder noted as "DIAG DEFERRED ON AXIS II OR I." (AR 468.)

### iii. *2014 Medical History*

In 2014, Plaintiff began seeing Dr. Moizeau at Clearlake Family Health Center. (AR 480.) At the beginning of the year, Dr. Moizeau noted Plaintiff's active problems as bipolar depression, chronic generalized pain, chest pain, elevated transaminase level, and morbid obesity. (AR 481, 492.) She referred Plaintiff to the Live Well program to address her morbid obesity, which she qualified as "life threatening." (AR 482, 494.) In July, Plaintiff requested In-Home Supportive Services ("IHSS") paperwork from Dr. Moizeau because she reported she was "so heavy that it is getting hard to do housework." (AR 568.) During one of Plaintiff's visits, Dr. Moizeau examined her for knee and back pain and concluded that Plaintiff's knees were normal and that her back had normal alignment with the vertebral bodies and posterior elements intact, but that there was a mild disc space narrowing at L4-5 and L5-S1. (AR 386–88.) Plaintiff saw Dr. Moizeau in May and August for medication refills. (AR 545, 776.)

Throughout early 2014, Plaintiff saw nurse practitioner Sandra Peeke again for nutritional consults regarding her obesity. During these visits, Ms. Peeke noted that Plaintiff "present[ed] for obesity/weight loss" (AR 485); Plaintiff's general health status was "good" or "fair" (*Id.*, 519, 526); but that Plaintiff was shaking, which may have been due to her Lithium level being too high. (AR 507.) In February, nurse Peeke made the following diagnosis: obesity, foot pain (bilateral), SI joint arthritis, snores, pes planus, lumbar facet arthropathy, trochanteric bursitis of both hips, chest pain NOS, swelling of extremity, depression screening, depression, and anxiety. (AR 505.) In March, Ms. Peeke made the following diagnosis: degenerative disc disease (lumbar), lumbago, morbid obesity, pes planus. (AR 531.)

One month later, Plaintiff began regularly seeing nurse practitioner Myrna Filman for bipolar depression. (AR 533.) With Ms. Filman, Plaintiff worked to taper herself off of anxiety medication Ativan. (AR 534.) In all sessions, nurse Filman noted that Plaintiff was stable. (AR 534, 538, 541, 544, 554, 557, 567, 585, 785, 795, 799, 833, 836, 842.) During some of these same sessions, however, nurse Filman also noted that Plaintiff's medication was not helpful in decreasing her anxiety, and instead, that the medication caused Plaintiff to feel angry, and that the course of her diagnosis was worsening. (AR 836, 840, 842.)

When her mother passed away in April, Plaintiff told Ms. Filman that she had an episode of cutting. (AR 542.) One month later, Plaintiff was feeling better on a reduced dose of Xanax, and stated that she was "holding the family together" after her mother passed away, and although her daughter was recently hospitalized for suicidal ideation. (AR 552.) In July, Plaintiff reported she was no longer taking pain opioids, and was seeing a private therapist to work on anger issues. (AR 565, 583.) But later in October, Plaintiff reported to Ms. Filman that she was feeling "more depressed due to lack of money and second suicide attempt by her ten year old daughter." (AR 793.) Plaintiff then started a new job as a phone dispatcher, a "sit down" job that she was "very happy with." (AR 797.) In December, however, Plaintiff stated she was having "increased anxiety." (AR 831.) Plaintiff also stated she had obtained an IHSS worker who had been helping her with cleaning, and that she quit her job because she "couldn't keep up." (AR 831.)

In the meantime, psychologist Dr. Alexandra Clarfield evaluated Plaintiff for pre-bariatric surgery in September. (AR 786.) Dr. Clarfield reported that Plaintiff was morbidly obese at 393 pounds and had several health complications associated with her obesity. (*Id.*) Dr. Clarfield diagnosed the following: anxiety, bipolar 1 disorder, and morbid obesity. (AR 788.)

As Plaintiff mentioned to nurse Filman, she was also receiving mental health treatment at Lucerne Community Clinic for her bipolar disorder. (AR 890–925.) In May, social worker Bigelman noted that Plaintiff relapsed on crystal. (AR 902.) In June, he noted that "[d]espite saying that she isn't taking substances, [Plaintiff] stated that she ran out of Ativan early and has been drinking 'some.'" (AR 903.) In August 2014, Plaintiff began seeing social worker Deborah

Johnson instead of Mr. Bigelman. (AR 905.) During her sessions with Ms. Johnson, Plaintiff recognized she had a "cycle of using/relapsing every 4-5 months." (AR 910.)

Plaintiff's weight over this time period fluctuated from 401 pounds in January 2014 to 436 pounds in October 2014. (AR 484, 69.)

### iv. *2015 Medical History*

Plaintiff saw various physicians for different health issues in 2015, including sinusitis (AR 851), leg swelling and degenerative disc disease (AR 876), bronchitis (AR 837, 926, 930), and headaches (AR 932, 941). Dr. Bloom also diagnosed paresthesias in Plaintiff's right hand, explaining that Plaintiff was feeling numbness in her fourth and fifth fingers because she "is working on her computer quite a bit and uses her right hand to control a mouse on a desk." (AR 26–7.)

Plaintiff continued to see social worker Deborah Johnson (AR 912), as well as nurse practitioner Myrna Filman to follow up on her bipolar disorder. (AR 843–82.) In January 2015, Plaintiff described her anxiety as "sweaty palms, increased heart rate and a feeling of impending doom." (AR 834.) Plaintiff reported this happened nearly every day. (*Id.*) Plaintiff stated her medication had been working for panic attacks, but she felt moody and more depressed. (*Id.*)

The treatment records end in late 2015, indicating that until at least September 2015, Plaintiff was continuing to see Ms. Filman for symptoms of bipolar disorder and generalized anxiety disorder. (AR 882.) In late 2015, Plaintiff was also still seeing Ms. Johnson weekly to monitor her bipolar disorder. (AR 921–25.)

### B. Medical Evaluations

In addition to routine and emergency medical visits, Plaintiff underwent several examinations to determine her functional capacity in support of her application for disability benefits. Below is a summary of these evaluations.

### i. *Treating Social Worker Deborah Johnson*

In September, social worker Johnson filled out a mental impairment questionnaire. (AR 801.) In Ms. Johnson's professional opinion, Plaintiff was not capable of performing a full-time job, working eight hours a day, five days per week, on a regular and continuing basis. (*Id.*) Ms.

1    Johnson further noted that Plaintiff's mental impairments markedly imposed on the following

2    functional limitations: the ability to remember locations and work-like procedures; the ability to

3    understand, remember and carry out simple instructions; the ability to maintain attention and

4    concentration for extended periods; the ability to work in coordination with or proximity to others

5    without being distracted; the ability to make a simple work related decision; the ability to accept

6    instructions and respond appropriately to criticism from supervisors; the ability to respond

7    appropriately to changes in the work setting. (AR 802–03.) Finally, Ms. Johnson stated that on

8    average, she anticipated Plaintiff's impairments or treatment would cause her to be absent from

9    work more than three times a month. (AR 803.)

10              **ii.**    ***Psychological Consultative Examiner Dr. Bonnie Yee***

11        On August 23, 2014, Dr. Yee assessed the mental impairments affecting Plaintiff's

12   functioning at the request of the Social Security Administration ("SSA"). (AR 646.) Dr. Yee's

13   findings were gathered during a one-time mental status evaluation. (*Id*.) In this evaluation,

14   Plaintiff reported depression and PTSD as a result of domestic violence in her marriage. (AR

15   647.) She also reported a family history of bipolar disorder, manic episodes, and a history of

16   depression since childhood. (*Id*.) She stated that she began to have suicidal ideations at 12 years

17   of age. (*Id*.) Her medications at the time included: Xanax, Abilify, Buspar, Cymbalta, Desyrel,

18   Lithium carbonate, and Klonopin. (*Id*.)

19        Dr. Yee noted that Plaintiff is able to complete most activities of daily living. (*Id*.) She is

20   able to drive a car, dress and bathe herself, and do light household chores such as grocery

21   shopping. (*Id*.)

22        In her mental status evaluation, Dr. Yee's diagnostic impressions were the following: signs

23   or symptoms of trauma based disorder evidenced by Plaintiff's physical scars of self-mutilation

24   and Plaintiff's low mood. (AR 648.) As a result, Dr. Yee recommended counseling for

25   psychiatric dysfunction. (*Id*.) However, from a psychological standpoint, Dr. Yee stated that

26   Plaintiff should have no difficulty performing simple and repetitive tasks, although she may have

27   mild difficulty performing complex and detailed tasks. (*Id*.) In particular, Dr. Yee noted that

28   Plaintiff may not regularly attend work. (*Id*.) She also stated that Plaintiff may have moderate

difficulty working with the public, supervisors, and co-workers, and that Plaintiff would most likely have difficulty handling the stress of employment. (*Id.*)

### iii. *Psychiatric Consultative Examiner Dr. Kang*

Dr. Kang reviewed Plaintiff's problem list from St Helena Hospital, as well as Dr. Yee's report. (AR 128.) Dr. Kang noted that Plaintiff had a history of depression and PTSD, but mentioned Plaintiff's unremarkable mental status exam and the fact that Plaintiff was not in treatment. (*Id.*) Dr. Kang concluded that Plaintiff had no severe mental impairment, and that she had the residual functional capacity for medium work with some postural and environment limitations. (*Id.*) Dr. Kang also found that Plaintiff could perform her past relevant work as a caregiver as generally performed in the national economy. (AR 132.)

### iv. *Consultative Examiner DEA A. Bailey*

DEA Bailey reviewed Dr. Yee and Dr. Kang's reports, as well as Plaintiff's function report, and concluded that Plaintiff had severe obesity, but no severe mental impairment. (AR 127.) DEA Bailey suggested that Plaintiff should be able to do simple, repetitive tasks with limited public contact. (*Id.*)

### v. *Consulting Physician Dr. K. Beig*

Dr. Beig completed a physical residual functional capacity assessment on behalf of the SSA. (AR 129.) Dr. Beig concluded that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and stand or walk for a total of six hours in an eight-hour work day. (AR 130.) Dr. Beig found that Plaintiff had additional limitations based on her morbid obesity: (1) postural limitations (Plaintiff may only occasionally climb ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl); and (2) environmental limitations (Plaintiff must avoid concentrated exposure to extreme cold and heat). (AR 130–31.)

## C. Other Evidence

### i. *Friend Devon Lemmenes*

Devon Lemmenes, Plaintiff's friend, completed an evaluation on July 24, 2014 at the SSA's request. At the time, Ms. Lemmenes had known Plaintiff for a year and a half. (AR 303.) Ms. Lemmenes commented that she felt Plaintiff was capable of working but was "too lazy to do

9

so." (*Id*.) Ms. Lemmenes noted that Plaintiff had worked for her company and was fired "for taking naps on people's couches while she was supposed to be working with her clients." (*Id*.) She thought that a receptionist job would suit Plaintiff well "because it doesn't require her to stand or be physical." (AR 310.) Ms. Lemmenes also stated that Plaintiff's kids and fiancé helped to take care of household responsibilities. (AR 304.)

### ii.    *Letter by Ms. Young*

Nearly a year later, on April 14, 2015, Ms. Sheri Young, Shelter Manager at Freedom House, wrote a letter on Plaintiff's behalf after she entered the shelter on March 28, 2015 with her two children. (AR 341.) Ms. Young stated that Freedom House only offers refuge to domestic violence or sexual assault victims and their children. (AR 341.) Ms. Young noted that Plaintiff participated in all of the shelter's programming, including weekly support groups, such as the domestic violence group, nurturing parenting class, and seeking safety group. (AR 341.) Plaintiff also attended one-on-one counseling and case management with her assigned domestic violence advocate. (AR 341.)

### iii.    *Letter by Plaintiff*

On April 21, 2015, Plaintiff submitted a letter as proof of homelessness, exhausted payments, and income. (AR 345.) Plaintiff stated that payments she received from State Disability were exhausted in July 2014, and that she was receiving cash aide and food stamps since then. (AR 345.) Plaintiff also stated she and her family were homeless because of her disability. (AR 345.)

## II.    The ALJ Hearing

On October 26, 2015, Plaintiff appeared with counsel at her scheduled hearing before ALJ Kwon in San Rafael, California. (AR 55.) Plaintiff and VE Lynda Berkeley both testified at the hearing. (*Id*.)

## A. Plaintiff's Testimony

### i. *Mental Condition*

Plaintiff has been seeing two psychiatrists, nurse practitioner Filman[2] since around 2010 or 2011 (AR 73), and social worker Johnson since around 2013 or 2014. (AR 75.) Plaintiff sees Ms. Filman once a month, or every other week, to obtain prescribed medication. (AR 72, 74.) She used to see her once a week until 2014, when Medi-Cal changed the required number of visits. (AR 74.) Plaintiff sees Ms. Johnson twice a month for longer sessions to receive psychotherapy. (AR 73.) Ms. Johnson makes sure that Plaintiff is taking her required medication, including Lithium, and administers blood tests. (AR 75.)

Plaintiff experiences anxiety, depression, mood swings, and post-traumatic disorder. (AR 80.) For example, Plaintiff recounts "scar[ing] to death" a young boy who threw a football at her child's stomach because she "overreacted." (AR 81.) Plaintiff also remembers that when someone accused her of doing something she had not done at work, she responded by "tell[ing] her off in text messaging," which later resulted in losing her job. (AR 84.) Plaintiff also "took three boulder rocks, and [] smashed out [her boyfriend's] windshield" when she thought he was cheating on her. (AR 85.) Plaintiff explains that her therapist has referred to these incidents as "manic episode[s]." (*Id.*) With regards to domestic violence, Plaintiff has been both a victim and a perpetrator. (AR 87.) Her anxiety also makes it impossible to take public transportation because of the people around her on the bus. (AR 102.) When asked about pain infliction, Plaintiff noted her piercings and episodes of cutting. (AR 109.) As to drugs and alcohol, the last time Plaintiff drank was in 2014, when her mother passed away. (AR 90.) Before then, Plaintiff was drinking hard liquor around once a month (two or three times at the most). (AR 91.) At the time of the hearing, Plaintiff was depending on benefits from cash aide and food stamps. (AR 76.)

### ii. *Physical Condition*

Plaintiff sees Dr. Park for her heart. (AR 77.) Dr. Park advised Plaintiff that she has high blood pressure, for which she is taking two medications, and has diagnosed her with angina, which

---

[2] Although the transcript refers to "Mirna Feldman," the Court assumes this refers to Myrna Filman, whose name appears through Plaintiff's treatment records.

United States District Court
Northern District of California

mimics a heart attack. (AR 77–8.) Since 2013 or 2014, Plaintiff has been experiencing heart symptoms when she is anxious up to a few times a day. (AR 78.)

Plaintiff also has difficulty putting her shoes on, bathing, showering and getting dressed, going to the bathroom, and clipping her toenails. (AR 79, 107, 108.) Currently, Plaintiff's daughter helps her with these activities and with personal care. (AR 97.) Before her daughter, in 2014, Plaintiff had IHSS workers help with laundry, dishes, garbage, and household chores. (AR 102–03.) Sitting is generally okay for Plaintiff, but standing up for more than around five minutes is difficult on her feet and hips due to her weight. (AR 104.) Plaintiff can only carry around eight pounds at a time, or the equivalent of a milk carton, and maybe a bag in the other hand. (AR 105.)

Plaintiff spends her days reading and conducting research on the Internet. (AR 98.) She is active in her church, which she attends every Sunday. (AR 96.) Until 2015, Plaintiff drove every day, although she had trouble getting out of the car. (AR 100, 105.) Since July 2015, however, Plaintiff has been unable to drive because she lost her license due to unpaid tickets. (AR 99.)

### iii. *Devon Lemmenes*

Plaintiff testified that Ms. Lemmenes' evaluation was inaccurate and written to be "vindictive" because of a falling out the two of them had over a dispute regarding Ms. Lemmenes' boyfriend. (AR 110.)

## B. Vocational Expert's Testimony

At the ALJ's request, VE Lynda Berkeley, who reviewed Plaintiff's file and was present for Plaintiff's testimony, testified regarding Plaintiff's ability to perform her past work. The ALJ classified Plaintiff's past relevant work as an instructional aide and home health aide as "caregiver" (DOT 3 354.377-014), which required performing at medium strength levels. (AR 114.) The VE noted Plaintiff's work was not that of a regular teacher's aide because she was required to perform physical activities beyond the classroom. (AR 115.)

The ALJ then posed several hypotheticals to the VE to determine whether there were jobs existing in significant numbers in the national economy that Plaintiff could perform given her impairments. (*Id*.) The ALJ began with a hypothetical that considers an individual with the Plaintiff's age, education, and background, along with the following characteristics:

12

> Individual can perform sedentary work. She can occasionally perform postural activities, but never climb any ladders, ropes, scaffolding, for safety reasons. She should avoid working at heights or with heavy or hazardous machinery. Also avoid driving. The work should not include regular interaction with the general public or regular teamwork, projects with co-workers. So, a job that one can do pretty much on their own.

(*Id.*) The VE responded that Plaintiff could not perform her past caregiver job. (AR 115.) The VE was asked about and suggested three examples of jobs that would fit the criteria advanced by the ALJ: (1) document preparer (DOT 2 249.587-018), which requires performing at sedentary strength level (AR 116); (2) addressing clerk (2 209.587-010); and (3) tube clerk (2 239.687-014). (AR 116.) The VE noted that most sedentary jobs have phone contact, but these, and a few others, have no public contact. (AR 117.)

Next, the ALJ posed a slightly modified hypothetical to the VE. She asked the VE "if I added to hypothetical number one the need to miss work because of medical issues, and the frequency of the absences from work – let's say it's, on average, two days or more every single month because of medical problems – what does that do to those representative three jobs, and any competitive work, for that matter?" (*Id.*) The VE responded that under such conditions, and based on her professional experience, not the DOT, all employment would be precluded. (*Id.*) Plaintiff's attorney then asked the VE her opinion on people who are off-task ten percent of the time. The VE specified that ten percent is their benchmark, that is, anything above that would generally preclude employment, again based on the VE's professional experience, not the DOT. (AR 118.)

## III.    The ALJ's Findings

In a February 2016 written decision, the ALJ found Plaintiff not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. (AR 38–9); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

At step one, the ALJ concluded that Plaintiff was disabled because she has not engaged in substantial gainful activity since October 1, 2013, the alleged onset date. (AR 40); *see* 20 C.F.R.

§§ 404.1571 *et seq.*, 416.971 *et seq.* While the ALJ noted that Plaintiff earned $3,741.77 in 2014, the ALJ concluded that this amount did not constitute substantial gainful activity. (*Id.*)

At step two, the ALJ determined that the objective medical evidence indicates that Plaintiff's depressive disorder, anxiety disorder, PTSD, morbid obesity, and coronary artery disease constitute "severe impairments" within the meaning of the regulations. (*Id.*); *see* 20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step, the ALJ concluded that Plaintiff did not have an impairment or a combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 41.) At this step, the ALJ noted that obesity was not a listed impairment. (*Id.*) The ALJ then considered whether Plaintiff's mental impairments met the listing of Sections 12.04 and 12.06, paragraphs (B) and (C). (*Id.*) With regards to paragraph (B), she concluded that they did not, on the grounds that Plaintiff's mental impairments do not cause (1) at least two "marked" limitations, where a marked limitation means more than moderate but less than extreme, or (2) one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, which means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. (*Id.*) With regards to paragraph (C), the ALJ concluded that Plaintiff's mental impairments did not satisfy the criteria because the evidence fails to establish Plaintiff's complete inability to function independently outside her home. (*Id.*)

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work (20 C.F.R. §§ 404.1567(a), 416.967(a)) except with occasional posturals, and that Plaintiff may not "climb ladders, ropes, or scaffolds; [] work at heights or with heavy hazardous machinery as safety precautions; [or] [] interact[] with the general public." (AR 42.) At this step, the ALJ noted that Plaintiff's impairments could reasonably be expected to cause the symptoms she reported, but that her "statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible…" (*Id.*)

To reach this conclusion, the ALJ gave great weight to the diagnosis of Dr. Bonnie Yee, psychological CE, based on the fact that her findings were consistent with the record as a whole.

14

(AR 44.)  The ALJ gave "less weight" to Ms. Johnson's mental impairment questionnaire on grounds that it appears to be based primarily on Plaintiff's subjective complaints, and because Ms. Johnson is "not an acceptable medical source and the questionnaire was not co-signed by a supervising psychologist or psychiatrist."  (AR 45.)  The ALJ also gave little weight to Ms. Devon Lemmenes' July 27, 2014 statement because it was not necessary to reach a decision.  (*Id.*)  Lastly, the ALJ noted that Ms. Young's April 14, 2015 letter was "taken into account."  (*Id.*)

At step four, the ALJ found that Plaintiff is unable to perform any past relevant work based on the VE's testimony that the instructional aide and home health aide both exceeded the RFC.  (*Id.*)

At step five, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy, such as document preparer, and tube clerk.  (AR 46.)

## IV.    Appeals Council

Plaintiff filed a request for review on March 16, 2016, arguing that the ALJ committed errors of law and that her decision was not supported by substantial evidence.  (AR 19.)  The Appeals Council denied Plaintiff's appeal on May 24, 2016, concluding that Plaintiff's additional evidence did not provide a basis for changing the ALJ's decision, and that there was therefore no reason to grant review.  (AR 5–6.)  The Appeals Council's decision rendered the ALJ's opinion final.

## DISCUSSION

Plaintiff challenges several aspects of the ALJ's decision.  The first two pertain to the ALJ's consideration of the medical evidence related to Plaintiff's alleged impairments: (1) the ALJ failed to properly weigh the medical opinions insofar as she "cherry-picked" from CE Dr. Yee's opinion, and assigned little weight to treating source Ms. Johnson's assessment, and (2) the ALJ failed to properly weigh the medical evidence and improperly concluded that Plaintiff's bipolar disorder was non-severe at Step 2.  Plaintiff also maintains that the ALJ incorrectly evaluated Plaintiff's subjective complaints and credibility.  Lastly, Plaintiff contends that the ALJ erred as a matter of law by failing to include all of Plaintiff's impairments in the RFC analysis,

United States District Court
Northern District of California

including the limiting effects of Plaintiff's "morbid obesity," which rendered the VE hypotheticals incomplete.

## I. The ALJ's Consideration of Medical Opinion Evidence

### A. Legal Standard

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations omitted). Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014) (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Hill v. Astrue*, 388 F.3d 1144, 1159 (9th Cir. 2012) (internal citations omitted). "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings." *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207–08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey*, 849 F.2d at 422.

### B. Analysis

To reject the opinions of Plaintiff's examining psychological specialist Dr. Yee and long-term treating social worker Ms. Johnson, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for doing so. *See Lester*, 81 F.3d at 830–31. The ALJ did not do so.

#### a. *Psychological CE Dr. Bonnie Yee*

The ALJ gave significant weight to the psychological assessment of examining physician Dr. Yee because it was consistent with the record as a whole. In her assessment, Dr. Yee concluded that Plaintiff is able to complete most activities of daily living, and that she should have no difficulty performing simple and repetitive tasks, although she may have mild difficulty performing complex and detailed tasks. (AR 647–48.) However, Dr. Yee also noted that Plaintiff may not regularly attend work, that she may have moderate difficulty working with the public,

supervisors, and co-workers, and that Plaintiff would most likely have difficulty handling the stress of employment.  (AR 648.)

Plaintiff argues that the ALJ's summary ignores the portions of Dr. Yee's opinion which reflect limitations on Plaintiff's ability to work.  In particular, Plaintiff points to the ALJ's failure to consider Dr. Yee's opinion that (1) Plaintiff's functional capacity was limited because of her bipolar disorder and PTSD; (2) Plaintiff could not handle the stress of employment; and (3) Plaintiff "may not regularly attend work."  *Compare* AR 648–49 (Dr. Yee's psychiatric evaluation)*, with* AR 44 (ALJ's February 2016 decision).  The Commissioner maintains that the ALJ was not required to adopt the entirety of Dr. Yee's function assessment because some of it was cast as "recommendations," not "imperatives."  (Dkt. No. 25 at 5:8-12 (citing *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008).)  In particular, the Commissioner emphasizes that while Dr. Yee stated that "claimant should have no difficulty performing simple and repetitive tasks," the remainder of Dr. Yee's recommendation was framed as Plaintiff "may have difficulty" and "would most likely have difficulty."  According to the Commissioner, the ALJ was free to disregard these non-imperative recommendations based on *Carmickle v. Comm'r Soc. Admin.*, 533 F.3d 1155 (9th Cir. 2008).  The Court disagrees.

In *Carmickle*, the Ninth Circuit found that the ALJ did not err in rejecting one treating physician's recommendation that the plaintiff use a reclinable desk chair while working in light of a subsequent opinion by another treating physician that concluded that the plaintiff could only sit for short periods of time and needed the option to alternate positions frequently.  *Carmickle*, 533 F.3d at 1165.  The plaintiff had argued that this was in error because the second physician's opinion also stated that he agreed with the first physician's opinion, which plaintiff insisted would necessarily include the reclining chair option.  *Id*.  The Ninth Circuit rejected this argument concluding that the ALJ's decision was rational since the first physician's opinion "was offered as a recommendation, not an imperative."  Here, in contrast, the ALJ was not weighing the opinions of two treating physicians; rather, she was cherry-picking portions of the opinion of one treating physician.  *See Diedrich v. Berryhill*, 874 F.3d 634 (9th Cir. 2017) ("It was improper for the ALJ to discount Diedrich's testimony by "cherry pick[ing]" the absence of certain symptoms from this

report."); *Williams v. Colvin*, No. ED CV 14–2146–PLA, 2015 WL 4507174, at \*6 (C.D. Cal. July 23, 2015) ("An ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination") (internal citation omitted). The Commissioner's argument that the ALJ was entitled to ignore portions of Dr. Yee's diagnosis based on semantics is unpersuasive. Dr. Yee was assessing Plaintiff's mental impairments—she cannot necessarily know that Plaintiff will miss three or more days of work per month, but she can prognosticate that she may, based on her examination and the weight of the medical evidence.

The Commissioner's alternative suggestion that the ALJ did not err because she did not rely solely on the opinion of Dr. Yee in assessing Plaintiff's RFC, but also discussed the opinion of at least six other medical sources, is equally unpersuasive. An ALJ errs when she fails to offer "specific and legitimate reasons that are supported by substantial evidence in the record" for rejecting the opinion of an examining physician. *Lester*, 81 F.3d at 830–31 (internal citations omitted). The question of whether that error was harmless because other medical sources supported the ALJ's RFC is discussed below.

In sum, the ALJ erred in failing to provide specific and legitimate reasons for discounting portions of Dr. Yee's opinion while giving the remainder of her opinion great weight.

**b. *Social Worker Deborah Johnson***

Next, Plaintiff argues that the ALJ erred in assigning "little weight" to the opinion of Plaintiff's social worker Ms. Johnson. The ALJ gave her opinion less weight because: (1) as a social worker, she was not a medically acceptable source, and (2) her opinion was inconsistent with the objective findings and appeared to be based primarily on Plaintiff's subjective complaints. Although the ALJ stated she was giving "little weight" to Ms. Johnson's opinion, she effectively gave it no weight as she discredited all the functional limitations it recommended. The ALJ's decision to do so is not supported by substantial evidence.

The ALJ's first reason for discounting the assessment of Ms. Johnson—that she was not a medically acceptable source—is unavailing. The relevant SSA regulations state that "[o]nly physicians and certain other qualified specialists are considered [medically acceptable sources.]"

19

*Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (internal citations and quotations omitted); 20 C.F.R §§ 404.1513(a), 404.1513(d). Therapists and social workers do not qualify as acceptable medical sources, and thus are considered "other sources." *See* 20 C.F.R. § 416.913(d)(1); *Stephens v. Colvin*, No. 13-cv-05156-RS, 2014 WL 6982680, at *4 (N.D. Cal. Dec. 9, 2014) (holding that "[t]estimony from a treating therapist constitute[d] an 'other source'"); *Casner v. Colvin*, 958 F. Supp. 2d 1087, 1097 (C.D. Cal. 2013) (finding that a treating licensed clinical social worker was not an acceptable medical source). Even if Ms. Johnson is not an "acceptable medical source," given her long-term and close treating relationship with Plaintiff, the ALJ was not entitled to simply disregard her opinion. *See Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(1)–(2), (f) ("an ALJ must consider the opinions of medical providers who are not within the definition of "'acceptable medical sources.'"); *id.* § 404.1527(c)(2)(ii) (in determining the weight that should be given to an opinion, the ALJ should look at "the treatment the source has provided and … the kinds and extent of examinations and testing the source has performed or ordered from specialists").

In *Revels*, the Ninth Circuit found that a nurse practitioner who saw the plaintiff ten times in the span of two years, assisted in treating plaintiff's chronic pain, and referred her to various specialists, was an "other source" to whom the ALJ should have assigned weight. *See Revels*, 874 F.3d at 665. So too here. The record reflects that Plaintiff was seen at Lucerne Community Clinic, where Ms. Johnson works, since November 2010, and that Ms. Johnson personally saw Plaintiff 20 times from August 2014 to October 2015. (AR 801, 905–25.) During these visits, Ms. Johnson led 30-minute psychotherapy sessions with Plaintiff. (*Id.*) Ms. Johnson made referrals for Plaintiff and connected her to resources, monitored Plaintiff's mood, and worked on a relapse prevention plan. (*Id.*)

The ALJ found that Ms. Johnson nevertheless remained an unacceptable medical source because Dr. Gardner, her supervisor, did not co-sign Ms. Johnson's functional capacity assessment, and because nothing in the record suggests Ms. Johnson worked so closely with Dr. Gardner as to be considered his agent. This is unpersuasive. In *Revels* the fact that the nurse practitioner's assessment was co-signed by an acceptable medical source in her clinic was only

one of various elements considered by the Ninth Circuit in determining the weight to give to the nurse practitioner's opinion. *Revels* , 874 F.3d at 665. Moreover, the cases cited by the Commissioner in support of the ALJ's finding do not address the question at issue—whether the opinion of "other sources" may be given no weight if they are not co-signed by an acceptable medical source.

For example, in *Britton v. Colvin*, 787 F.3d 1011 (9th Cir. 2015), the Ninth Circuit was concerned with whether the opinion of an "other source" should be accorded deference as medical testimony under certain circumstances. The court concluded that the ALJ did not improperly weigh the testimony of a nurse practitioner because nothing in the record indicated that the nurse worked so closely under a physician as to be considered his or her agent. *Id.* at 1013 (citing *Gomez v. Chater,* 74 F.3d 967, 971 (9th Cir. 1996)). Here, in contrast, Plaintiff is not arguing that the ALJ should have elevated Ms. Johnson's assessment to that of an "acceptable medical source," but only that it should be assigned *some* weight in light of Ms. Johnson's long-term relationship with Plaintiff.

Likewise, *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), discussed the distinction between lay witness testimony from the plaintiff and his wife regarding whether the plaintiff's symptoms testimony limited his ability to work, which was permissible, and lay witnesses testimony which sought to provide medical diagnoses, which was not permissible. *See also Denison v. Colvin*, No. 2:16-CV-00021 JRC, 2016 WL 3610835, at *2 (W.D. Wash. July 6, 2016) ("[T]here are "other sources," such as friends and family members, who are defined as "other non-medical sources" and "other sources" such as nurse practitioners, physician assistants, therapists and "social welfare agency personnel," who are considered other medical sources.") (citing 20 C.F.R. § 404.1513 (d)). Here, Ms. Johnson is not a lay witness, but an "other source" under the regulations.

An ALJ may only discount the opinion of an "other source," such as a social worker, if she provides "reasons germane to each witness for doing so." *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017). That is, an ALJ may properly discredit a social worker's opinion if it is inconsistent with evidence in the record. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.

2005) (noting that "[i]nconsistency with medical evidence" is a "germane" reason for rejecting lay witness testimony); *Casner*, 958 F. Supp. 2d at 1098 (holding that the ALJ provided specific and legitimate reasons for rejecting a social worker's opinion because her opinion was inconsistent with four other medical opinions). Here, while the ALJ concluded that Ms. Johnson's assessment was contradicted by the record, she failed to cite any specific examples or evidence in support of this conclusion. (AR 45.) Although the Commissioner seeks to remedy this defect in her opposition brief offering a string cite to portions of the record which she contends contradict Ms. Johnson's findings (Dkt. No. 25 at 6:19–22), a reviewing court is "constrained to review the reasons the ALJ asserts." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

"[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13 (citing *Nguyen*, 100 F.3d at 1464). Here, the ALJ failed to offer any reasons let alone specific and legitimate reasons for rejecting Ms. Johnson's opinion that Plaintiff's impairments would cause her to be absent from work more than three times a month. Rather, the record shows this opinion is consistent with Plaintiff's functional capacity evaluation, and in particular with the opinion of the expert consultative psychologist, Dr. Yee, who noted that Plaintiff "may not regularly attend work." (AR 649, 803.)

The Court thus concludes that the ALJ erred in assigning little weight to the opinion of Ms. Johnson, Plaintiff's long term treating social worker.

### c. *The Severity of Plaintiff's Bipolar Disorder*

Finally, Plaintiff argues that the ALJ erred in failing to consider the medical evidence regarding her bipolar disorder and consider whether this was a "severe impairment" at step two of her analysis. An impairment is found "not severe" at step two of the ALJ's analysis "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85–28; *see Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

Here, there is substantial evidence documenting Plaintiff's diagnosis and treatment of bipolar disorder. At Lucerne Community Clinic, Dr. Gardner repeatedly diagnosed Plaintiff's bipolar affect between August and September 2013. (AR 368–69, 372–75.) Similarly, at St Helena Hospital, Dr. Wade noted "bipolar disorder, likely" in Plaintiff's history and physical examination (AR 430), and Dr. Mark Rose highlighted bipolar disorder in his final diagnosis. (AR 434.) In her visits with nurse practitioner Filman and Dr. Moizeau at Clearlake Family Health Center, Plaintiff's bipolar 1 disorder and bipolar depression were also continuously noted as "active problems." (AR 553, 843–82.) Long-term treating social worker Ms. Johnson also specifically noted signs and symptoms of Plaintiff's diagnosed bipolar 1 disorder and PTSD. (AR 890–925.) Lastly, Dr. Yee assessed the mental impairments affecting Plaintiff's functioning at the request of the SSA, and included bipolar disorder in her diagnostic impressions. (AR 648.) Plaintiff's testimony corroborates the record: she testified about her "manic episodes," anger outbursts, and difficulty in getting along with people. (AR 80–5.)

The ALJ, however, did not list bipolar disorder among Plaintiff's severe impairments. Instead, she listed: depressive disorder, anxiety disorder, PTSD, morbid obesity, and coronary artery disease. (AR 40.) The ALJ offered no rationale for her decision to omit bipolar disorder from Plaintiff's list of severe impairments, and the Commissioner offers none on appeal. Instead, the Commissioner argues that the ALJ's error was harmless. The Court disagrees.

While omissions at step two are often harmless error if step two is decided in plaintiff's favor, that is not the case here. *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). The ALJ's RFC failed to account for the specific, distinctive functional limitations of bipolar disorder. *See Hill*, 388 F.3d at 1151–53 ("Because the ALJ excluded panic disorder from Hill's list of impairments and instead characterized her diagnosis as anxiety alone, the residual functional capacity determination was incomplete, flawed, and not supported by substantial evidence in the record."). Although the ALJ found severe psychological impairments of depressive disorder, anxiety disorder, and PTSD (AR 40), and accounted for a psychological limitation in the RFC by limiting Plaintiff to the full range of sedentary work with some postural and non-exertional limitations, specifically having no work with the general public (AR 42–5), the ALJ failed to

consider the extent to which Plaintiff's bipolar disorder would cause her to regularly miss work. At Lucerne Community Clinic, Ms. Johnson determined that Plaintiff's diagnoses of bipolar 1 disorder and PTSD rendered her unable to "perform a full-time job, working 8 hours a day, 5 days a week on a regular and continuing basis" (AR 801), and would cause Plaintiff to be absent from work "more than 3 times a month." (AR 802–03.) Likewise, Dr. Yee diagnosed Plaintiff with bipolar disorder and concluded that she may not regularly attend work. (AR 649.)

Because the ALJ did not account for the fact that Plaintiff's bipolar disorder could prevent her from regularly attending work, the ALJ erroneously failed to account for restrictive aspects of well-supported, treating and examining assessments of the specific, disabling limitations of Plaintiff's bipolar disorder.[3] As such, the ALJ's error at step two was not harmless.

## II. The ALJ's Credibility Determination

### A. Standard for Assessing Credibility

To "determine whether a claimant's testimony regarding subjective pain or symptoms is credible," an ALJ must use a "two-step analysis." *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks omitted). The clear and convincing standard is "the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002). "General findings are an insufficient basis to support an adverse credibility determination." *Holohan*, 246 F.3d at 1208. Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimant[ ][is] not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see*

---

[3] Plaintiff argues that the ALJ also erred in failing to consider the relationship between Plaintiff's morbid obesity and her mental impairments in formulating her RFC. Given the Court's conclusion that the ALJ failed to consider the severity of her mental impairments generally, it is unnecessary to reach Plaintiff's specific argument regarding her obesity.

*also Ghanim*, 763 F.3d at 1163 ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citation omitted).

**B. Analysis**

Applying a two-step analysis, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the type of alleged symptoms," but Plaintiff's testimony "concerning the intensity, persistence and limiting effects of these symptoms" was not entirely credible for several reasons. (AR 42.) Since Plaintiff met the first part of the test, the ALJ could only reject Plaintiff's testimony regarding the severity of her symptoms due to evidence of malingering or by offering specific, clear and convincing reasons for doing so. *See Lingenfelter*, 504 F.3d at 1036. The ALJ erred in rejecting Plaintiff's testimony regarding the severity of her pain because there is no evidence of malingering, and the ALJ failed to meet the demanding clear and convincing reasons standard. *See Moore*, 278 F.3d at 924. The ALJ's finding that Plaintiff is not entirely credible was in error.

First, the ALJ failed to identify which testimony she found not credible. In *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015), the Ninth Circuit held that where an ALJ made a similar "conclusory statement"—that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (AR 42)—the ALJ was required to specifically identify which of the plaintiff's statements she found incredible and why. *Brown-Hunter*, 806 F.3d at 493. As in *Brown-Hunter*, the ALJ here erred because she found "based on unspecified claimant testimony and a summary of medical evidence, that 'the functional limitations from claimant's impairment were less serious than she alleged.'" *Id*.; *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (internal quotation marks and citation omitted).

The ALJ's only reference to a contradiction in Plaintiff's testimony is that "Claimant has a fairly active lifestyle despite her complaints." (AR 43.) The ALJ seems to base this conclusion on Plaintiff's testimony that she attends a Live Well program, is active in her church, takes care of

her daughter, does household chores, spends time on a computer, attended Yuba Community College, and worked as a phone dispatcher.  (*Id*.)  "Yet it is not inconsistent with disability that [Plaintiff] was not entirely incapacitated by fatigue at all times."  *Trevizo v. Berryhill*, 862 F.3d 987, 1002 (9th Cir. 2017).

The Commissioner's reliance on *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) for the proposition that "[e]ven where those activities suggest some difficulty in functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment," is unavailing.  In *Molina*, the Ninth Circuit found that "[t]he ALJ could reasonably conclude that Molina's activities, including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering from debilitating panic attacks.  *Molina*, 674 F.3d at 1113.  Here, neither the ALJ nor the Commissioner point to any specific contradictions of the sort by Plaintiff.  Rather, (1) the medical evidence is consistent with Plaintiff's allegations of disability, and (2) Plaintiff's activities of daily living are consistent with her allegations of disability.

First, the medical evidence is consistent with Plaintiff's allegations.  The ALJ points only to one purported inconsistency in the record, finding that Plaintiff's statement in a function report dated July 16, 2014 that she can barely walk or bend over and needs help with personal care was not credible because it was not in accordance with knee and lumbar spine x-rays performed in the same month.  (AR 45, 592–97, 720–22.)  In so concluding, the ALJ ignored the extensive degree of physical limitation caused by Plaintiff's morbid obesity apparent in the record.  (*See, e.g.*, AR 130–31, 494, 502, 516, 629 (noting chronic generalized musculoskeletal pain and cardiac problems due to the need for weight loss).)  The ALJ may not "cherry-pick evidence to support the conclusion that a claimant is not disabled," instead of consider[ing] the evidence as a whole in making a reasoned disability determination."  *Williams*, 2015 WL 4507174, at *6.

Second, Plaintiff's activities do not contradict her allegations of disability.  The ALJ ignored Plaintiff's testimony that she (1) receives significant help from her mother and oldest daughter  (AR 98, 103, 108–09); (2) qualifies for home-aid assistance from IHSS for 63 hours per

26

month  (AR 245, 568); (3) had to withdraw from multiple classes at Yuba Community College (AR 352); and (4) began work as a phone dispatcher, but couldn't keep up" two weeks later (AR 831).  *See Holohan*, 246 F.3d at 1207–08 (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment").

As such, the specific reasons the ALJ gave for disbelieving Plaintiff's testimony about the severity of her pain symptoms are not "clear and convincing."

\*\*\*

Given that the ALJ's consideration of the medical evidence and adverse credibility finding of Plaintiff are not supported by substantial evidence, the Court finds error in Plaintiff's RFC. Because this error goes to the heart of the disability determination, it is not harmless.  *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) ("An error is harmless if it is inconsequential to the ultimate nondisability determination," or "if the agency's path may reasonably be discerned"); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) ("[A] reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").

Because the Court concludes that the ALJ's analysis at step four was in error, the Court need not consider Plaintiff's additional arguments regarding the ALJ's formulation of Plaintiff's RFC.  As discussed below, the Court concludes that this case must be remanded for further proceedings.

**III.    The Scope of Remand**

Plaintiff asks the Court to remand for immediate benefits under the credit-as-true rule. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).  However, a court may remand for an immediate award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the

improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12–CV6179, 2014 WL 957025, at \*14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke*, 379 F.3d at 595); *see Leon v. Berryhill*, No. 15-15277, 2017 WL 5150294, at \*2 (9th Cir. Nov. 7, 2017) ("where […] an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." (citing *Treichler*, 775 F.3d at 1105)). Moreover, if "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled," a court should remand for further proceedings "even though all conditions of the credit-as-true rule are satisfied." *Garrison*, 759 F.3d at 1021; *see also Treichler*, 775 F.3d at 1106 ("[A] reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.").

Here, even if the record was fully developed and the improperly discredited evidence is credited as true, it is not certain that the ALJ would be required to find Plaintiff legally disabled under the third part of the credit-as-true standard. *Leon*, 2017 WL 5150294, at \*4. Because the record creates serious doubts as to whether Plaintiff is in fact disabled, the rare circumstances that result in a direct award of benefits are not present in this case. *See id*. The Court thus declines to reach the credit-as-true rule and must instead remand for further proceedings.

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 25) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 26). The Court VACATES the ALJ's final decision and REMANDS for reconsideration consistent with this Order.

This Order terminates Docket Nos. 24 and 25.

**IT IS SO ORDERED.**

Dated: November 30, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge